Good morning. May it please the Court, I'm Daniel Kaplan. I represent the appellant Elijah Arthur. I'm going to be watching the clock and try to save about three minutes or so for rebuttal. Okay, you know that you have to keep track of your own time. Understood. The leading question in this appeal is whether there is an unacceptable risk that impermissible factors came into play in the trial. The nature and extent of his gang involvement was a crucial disputed issue in the trial, and during the trial, uniformed law enforcement officers with uniformed T-shirts that bore the legend, State Gang Force, sat in the gallery. The answer to the question is yes. In order to examine it, we need to look at the full circumstances, the facts, the evidence, and the issues in the trial. How long were they in there before the judge did something about it? The record is not very clear on that. The minimum, as the government observes, the minimum was about an hour to an hour and a half, depending on how you interpret the record, because there was a comment about a break took place at about 2.38. There was a discussion of it sidebar at 3 p.m. And later in the day, and that was when there was a reference to them displaying these T-shirts, what's unclear is how long in the rest of that trial day they were displaying the T-shirts. It might have been from early on in the day for all the record shows. The evidence is a little unclear. If it was from early on in the day, it could have been six hours. But the minimum would be from that sidebar discussion at 3 p.m. on day two of the trial to the end of that trial day, which when the jury left, it was about 4.36. There was a sidebar discussion again around 4 p.m. There was a sidebar discussion when the jury left, where Mr. Sands, the defense counsel, said, I looked back at 4 when I was doing an examination. I saw the T-shirts. The tactical gang was still there. So the short answer is the record is not entirely clear. It was at least an hour to an hour and a half or so, but it could have been many more hours. Now they come back on another date, or is it just one time that they were there? There was uniform police presence on subsequent days, which was discussed. But the specific issue of the state gang force logos appears to have been confined to day two of the trial. Now, as your honors are aware, having looked at the record in this case, this is a case where there was an exhibit, which was a video of Mr. Arthur actually shooting the victim. And when Mr. Sands got up to give the opening statement for defense, he right off the bat said to the jury, Mr. Arthur killed this officer. This was a senseless, and we're really here to argue one thing to you. There is a one key issue, and that is, was this premeditated? This trial was about the issue of premeditation. Now, the jury had many facts that would make them reasonably wonder and doubt that there was premeditation. If you had to come up with a law school hypothetical scenario of a second degree so-called killing on impulse, this would be a pretty good example or a scenario to use. There was no connection between Mr. Arthur or the other people in the car that was shown between them and this police officer. There was no apparent motive for this killing. There was clearly no escape plan. Right after the shooting, in the seconds after the shooting, Mr. Arthur, who had no underwear and no shoes, ran off into the darkness, dropped his gun right out in the open, and started trying to hide behind bushes at the Walmart. The driver of the car, Mr. Thomas, appeared to sit frozen, possibly in shock, for quite a while while officers swarmed around from the entire area. They were there for a DUI task force. And then later emerged that he had wet his pants. And Mr. Gutierrez, the other passenger in the car in the second or so after the shooting, came out with his hands up and ran off into the darkness and was later apprehended elsewhere on the reservation. And speaking of Mr. Gutierrez, there was a reference in one of the sidebar discussions by Judge Logan to the notion that he was supposed to be the government's so-called ace in the hole. Apparently there was some expectation he was going to say something that would indicate real premeditation happened. In fact, when he testified, he was described by many witnesses as a founding member of the Eastside Bloods gang. When he testified, he said he was not familiar with that gang. He also apparently was not able to identify or acted like he was not able to identify Mr. Arthur on the stand. So much for the ace in the hole to prove premeditation. What the government was left with to make that case on that sole, crucial, important disputed issue of premeditation was taking all the gang evidence, all the stuff connecting Mr. Arthur to this Eastside Bloods gang, scraping it all together and trying to make it show that he was not only connected to the gang, not only surrounded by signs and people involved in this gang, but a serious, committed, hardened gang member, so seriously committed that he would do this. He would shoot a cop in cold blood just to gain status in the gang. Now, I certainly will acknowledge that the gang-related evidence was ample. Your Honor. However, it was not clear what all that gang-related evidence meant. There was evidence that he joined as a young boy of 10, that he was formally taken out of the gang through this difficult ceremony when he was about 17, that his participation waxed and waned. And on this evidence, a reasonable jury would have to ask itself, clearly there's some connections, and clearly he wears the red, and clearly he says things like become Bloods. But the Crips and the Bloods, according to the expert testimony and the evidence, they're kind of like the Hatfields and McCoys of gangs. And the testimony was there are Crips on this reservation as well as Bloods. And the question is, if the jury is asking itself, what does this all mean, they're probably going to say to themselves, or they may well say to themselves quite reasonably, if you're in a Hatfield-McCoy situation and your cousin is a serious Hatfield, and you live in a Hatfield house with a Hatfield logo outside your window, and Hatfield people are surrounding you every day, do you feel some peer pressure to wear that color, to proclaim yourself affiliated? And does that really mean that you're a serious member of that clan and would do things that are going to put you in jeopardy like this just to gain status? Or does it just mean you're trying to get along in that situation with those  And in that situation was introduced official, uniformed law enforcement officers representing clearly a government entity proclaiming state gang force. And it's the kind of thing that we're talking about. What was the defense at trial? What was the defense? The defense of diminished capacity or something like that? There was certainly a lot of evidence elicited by defense about diminished capacity that he was under the influence at the time of methamphetamines, alcohol, and marijuana. And largely the defense is what I'm saying now, which was that he had these gang ties, he was in a gang environment, but he was really not a serious gang member and not the kind of a gang member so committed to that project that he would do something like this for the reasons the government was suggesting. And what was the jury instructed? Was it instructed on diminished capacity or anything like that or? I believe they received the voluntary intoxication defense. I believe so. If I check and find that's wrong, I'll let the Court know. Okay. But I don't know. So that's a situation where the question this Court needs to ask itself on those facts is under the standard articulated in Norris, is there an unacceptable risk that impermissible factors came into play? And the answer on these facts is that there is that unacceptable risk given that we have apparent, well, clearly law enforcement officers in a uniform. And it's really, in significant respects, more of a risk than in Norris. Norris involved people who were civilians and not wearing any type of uniform, not representing or purporting or appearing to represent any government entity, but just civilians wearing Women Against Rape buttons in a rape trial. They were in the case the whole time, were they not, in the Norris case? The findings after the hearing was held on remand is that at any given time, there were three of them in the trial, in the courtroom, and also in elevators and so forth. That's in Norris? In Norris. Yeah. In Norris. Are you saying it's a violation of Norris for a uniformed police officer to be in the courtroom during the trial? No. No. And, in fact, I certainly examined whether it should be argued as a reversible error that there was simply the uniformed officers per se under the Holbrook rubric, and felt that the law didn't seem to back that up. I'm specifically focusing on the gang message, because that went directly to a crucial issue that went to the real disputed question of this case, which was premeditation. Because the prosecution's theory was that he deliberately did this because it was gang-related. That was essentially the theory. And they had their expert testify, their gang expert testify, that a gang member would do this to gain status in the gang. And, of course, you know, that's how they focused on all the things that seemed to connect Mr. Arthur to the gang. And, by the way, I certainly would say that the letters from prison that became exhibits in the trial fit into the same narrative that I'm describing. Because Mr. Arthur sent letters after, when he was in prison, after this incident. And the gang expert identified Eastside Bloods formatting and crossing out the letter C, because that stands for Cripps and so forth. And that indicated him affiliating himself with this idea of the Eastside Bloods. But in the narrative that I'm describing that a jury could reasonably adopt, it still fits perfectly because, if you think about it, Mr. Arthur really had two choices after this killing, this shooting happened. He could be basically a fool who, for no reason, subjected himself to a life sentence and got nothing from it. Or he could proclaim, I am a hero gangster, which is essentially what he did, and become the hero of the Eastside Bloods who did this for the cause. It fits into the narrative of somebody who wasn't truly a committed gang member, who really didn't have that type of reason to premeditate. You didn't mention this conversation that he had with somebody else when he was in jail and said he was wanting to shoot at a supervisor. Wasn't that some evidence of premeditation? Well, obviously, that's the government's position. Our position is that evidence should not have come in because it's not truly probative for premeditation. It's probative that he made an extremely obnoxious and insensitive remark three months after the fact in a very jovial call with personal friends from the reservation. You're just saying it's not relevant. You're not saying it's illegal for him to introduce it. Well, yes, we did actually argue that it was improper under Rule 403 to introduce it, and I am arguing that on appeal as well, and that's in the briefs. It's if it had any relevance to... But doesn't it also... Counsel, doesn't it support two things, first, premeditation, and also the idea that a higher status victim would be more impressive to a gang, and in those two ways, relevant? And isn't it up to the jury to determine if that was a joke? Well, I don't believe there's any evidence that a higher status officer would be of more value in terms of the gang. In terms of premeditation, again, I don't believe it's truly probative that this type of joking comment was made three months after the fact in a call like this, the idea that that shows he premeditated three months earlier. I would like to say the bit of time I have left. I just ask you, the post-Miranda statements that the district court said were voluntary, what was the incriminating nature of those? Well, at the very end of the interrogation in the station house with Agent York and Urante, he said, I'm sorry I shot him. He said he was sorry he shot him, and he said he effed up. So he acknowledged the shooting. Obviously, the harmfulness is not huge because there was a video, but he also said things which the government used against him in closing because they showed, because he changed his story around and thought on his feet, so to speak, that showed he had the presence of mind, and it took away this idea that he didn't premeditate. So that was used against him. Roberts. Good morning, Your Honor. And may it please the Court, my name is Alexander Samuels. I'm an assisting U.S. attorney in Phoenix, Arizona. I'm here on behalf of the United States. I'd like to start with the first issue in the briefs, and I'd like to start by addressing one of Judge Seiler's questions because I think it touches on one of the most important points as it relates to this Court's analysis of that issue. Judge Seiler asked a question about the timing of when these two officers were in the courtroom, and I think it's important to note that the claim on appeal relates only to two officers who were in these T-shirts, not to all the officers who were in the courtroom, which was much of the objection below. These two officers, there's no evidence that they were in the courtroom throughout the day. There's no evidence that they were in the courtroom on any other day. In fact, there was a break that was taken in the afternoon around 235. It was only after they returned from the break that Mr. Sands' defense counsel requested a sidebar and made a full record about these two individuals' presence. Is this the first day of trial? This was the first day of testimony. The first day of trial, as we've referred to it in the briefs, was taken up entirely by jury selection. Right. Day two began with opening statements, and this occurred during that period. The first day that there was testimony. Precisely. And I think that's important, too, because the implication here by Mr. Arthur is that the jury would have not only seen this message, but would have interpreted it as furthering the government's case. I think that may read a little bit too much into what jurors knew at this point in the trial. At this point in the trial, they had an opening statement. There had been opening statements. There had been. And there was a very short section in the government's opening statement about gang affiliation. But the testimony throughout the first day of trial had nothing to do with that. It was all about the responding officers going to the scene, and the only other witness who I believe testified that day was the security officer from Walmart who. But you don't disagree that the theory of the prosecution was that this was gang-related, Ian? I think that was. Or that was part of the theory. That's right. And I'm sorry for interrupting. I think it was certainly one theory of the prosecution. The government did maintain below, and I would argue here, that it was not necessary to prove premeditation to prove that Mr. Arthur was doing this because of any sort of gang affiliation. I think there was other evidence in the case that showed that he premeditated this act at least for the couple of minutes leading up to it, and that that would be enough regardless of his gang affiliation. But certainly the gang affiliation was a central component of the government's case. But regarding the timing, and the reason I raised Judge Seiler's question is because when you look at this Court's case law and others, where courts have found problems, where courts have reversed, those are cases where the presence in the courtroom of whatever was in there was pervasive. In Norris, these individuals were in the courtroom throughout the trial. Norris cites a case from West Virginia where similar individuals were in a courtroom throughout the trial. Moose Ledeen, which was eventually reversed by the Supreme Court, same thing. And here, we simply don't have that. What we have is a fleeting presence of one or two hours. And in terms of whether we would need to have an evidentiary hearing on this issue, the district court was in the courtroom and was aware of their presence. Judge Seiler also asked how long it took for the district court to address this issue. And I think it's important to note how the district court addressed this issue. The issue was raised at sidebar, and the district judge noted right away that this was a potential problem. Although the district judge allowed uniformed police presence in the courtroom, which is not challenged on appeal, he said immediately, look, having individuals in these T-shirts that say gang on them, that's a problem. We need to take care of it. How do we best address it? And it was clear that the district court was concerned about further prejudicing the defendant. Having the individuals, having a government's counsel was suggested, go talk to these individuals, have them leave the courtroom. That would have obviously drawn attention to the issue and maybe had jurors turn their heads towards that part of the courtroom, which is in the back of the courtroom. And the district court didn't want to do that. So, in fact, what they discussed was to leave them in place for that time, but to ensure that someone spoke with those two individuals and the other police officers from these departments to make sure nothing like that happened again during the trial. At the end of the day, the district court took the additional step of addressing all the officers in the courtroom, talking about the incident that had happened and telling them, please avoid bringing in any sort of tactical vests, tasers or anything unusual other than just your ordinary uniforms, because the defendant has a right to be presumed innocent and has a right to a fair trial. This was outside the presence of the jury, I suppose. Yes, it was. It was, Your Honor. Did the defendant ask for a mistrial in this? Yes. The defendant did ask for a mistrial, and it's our position on appeal that the district court did not abuse its discretion by denying that motion, for all the reasons Did anybody ask for a hearing? Did the defense ask for that? They did, Your Honor, and Arthur now alleges on appeal that the district court abused its discretion both by denying the motion and by denying the request for a hearing. As it relates to the request for a hearing, I would note that this court's in a little This case was in a little different posture than some of the other ones cited by the defendant. Cases like Norris' trial was long gone by the time they were discussing whether to have a hearing on habeas review. So the verdict was already in place, and it was a question of inquiring into that verdict. If the district court had chosen to have a hearing in this case, it already had the information in front of it about what had happened in the courtroom. The key question would have been whether jurors saw this display by the two officers. Asking jurors that question would have perhaps by itself drawn attention to the issue in a way that nobody in the courtroom wanted to see happen. And so the district court had very good reason not to want to inquire further. And I would also note that I think inquiring further would have not changed the calculus, even if a juror had seen this particular display. It's not the type of display that is so pervasive that is so inherently prejudicial. What kind of hearing did the defense ask for, then? I don't believe that the defense was very specific about the request for a hearing, but it's certainly the case that they asked for something. I would note that the district court actually in the motion for mistrial, there were two issues within that motion which were the issue we're talking about now, and then an issue about press coverage related to officer shootings and to this particular case. And the district court actually did conduct some – a hearing may be a strong word, but did conduct some inquiry as to whether jurors had seen any sort of press coverage and things like that. So it's clear that the district court was attuned to these issues and was willing to talk to the jury when it thought it was appropriate to do so to ensure that the defendant was receiving a fair trial. This was very different than the trial judge in Norris who simply declared that he had no power whatsoever to address the issues. This district court talked a lot about the importance of these issues and inquired into them, and I think the manner in which it did so was not only proper, but was certainly not an abuse of discretion. There is some discussion about how the difference – one difference between this case and Norris is that the two individuals at issue here were government actors, they were police officers. I would note the message on their shirt that we're all talking about now was about the state gang task force. There were actually witnesses who testified at trial in this case who testified to their prior relationship with the state gang task force. The state – the government's gang expert, Detective Crasow, testified that he was a member of the – a career criminal unit, in essence, and had previously been a member of the state gang task force. And another individual testified that he worked for the Arizona Department of Public Safety, that he had, in 2011, been a member of the state gang task force, and that in that capacity he had talked to Mr. Arthur about his gang affiliation, and that was evidence that was presented at trial. So I don't think it's a – I don't think it's right when – when Mr. Arthur argues here that he was accused by these individuals in a way that was not from the witness stand. There were witnesses in this case that talked about this information, and so to the extent there was any sort of message conveyed by these shirts that the state gang task force was involved in the case, that message was conveyed directly from the witness stand by two government witnesses. In that regard, I would also note that the gang evidence in the case was quite strong. There was not only the testimony from the gang expert. There was Mr. Arthur's own admissions that he had been a Eastside Blood member. There were post-trial admissions in his letters – or not admissions, but ways in which he wrote in his letters that were very idiosyncratic and that were clearly ways that someone from the Eastside Bloods would write, and that there were Cs crossed out to signify disrespect to the Crips. There were Cs turned into Ks for the same reason. There were Bs underlined or capitalized in order to show respect for the Bloods. Judge Graber's point about the phone call, the admission of which is challenged here, in which he said he was aiming at a supervisor, I don't believe this is in the briefs, but the way that – that portion of the phone call starts is the other individual on the I love that. And so there was clear evidence in the record that Mr. Arthur did receive some sort of elevation and status, both from his friends and from other individuals who may have been affiliated with the gang, consistent with the government's theory at trial. Was the other person identified ever? The person on the other end of the phone call? I don't believe that their identity was – I don't know if they were identified, but I certainly don't think the identity was discussed at trial. And so I don't – I don't know if we know that that person was a gang member, for example. The police were following? In terms of the way that this incident started? Started, yeah. Yeah. I think that's an important point to make. So what happened is the – the Salt River Reservation, as Your Honor might know, it directly borders Scottsdale, Arizona. And so the individuals, including Mr. Arthur, were driving westbound on Chaparral Road towards Scottsdale. The officer was actually driving in the opposite direction towards the center of the reservation. They came to a stop sign, and it was at that stop sign – and this is captured on the dash camera – that Mr. Thomas, the driver of Mr. Arthur's car, actually flashed his lights in what the government contended was some sort of signaling at the officer. The officer then turned around and chased after Mr. Thomas after he sped off from the stop sign and activated lights to pull over Mr. Thomas. Instead of pulling over on the side of the road, the car then pulled into the Chevron station where this happened and pulled into the parking spot. The Chevron station was on Chaparral? Yeah. It was at the corner of Chaparral and Pima Roads. The – one other interesting thing that's seen on videotape is – but the Chevron footage, which shows the opposite angle, talking about premeditation, even if just for a short period of time, there was testimony that the doors automatically locked in the car and so that Mr. Arthur would have had to ensure the doors were unlocked. He actually unlocked or opened the door as the car was still moving, and you can see on the Chevron footage he actually balances himself on the edge of the car with the firearm, which he would have had to make sure the safety was off on and the bolt was pulled back and the gun was loaded. And then as soon as the car stopped, he jumped out of the car and shot at Officer Cabrera twice. With that, unless the Court has any other questions, I know there were other issues briefed in the case and I'd be happy to address them. Are there any further questions? There don't appear to be any. Thank you, Counsel. Thank you, Your Honors. Thank you. It's very interesting to me that the government would say, don't worry about the people in the gallery, the officers with the state gang force logos, because there were witnesses on the stand who said they were with the state gang force. That telegraphs to me that the government doesn't get it. The witnesses who take the stand are subject to cross-examination. That's the problem. That's what Norris was largely about. The problem is you have people who are not subject to cross-examination who are telegraphing an important message that goes straight to the key disputed issue in the case sitting in the gallery. That's exactly what the problem is here under Norris. So the district court was there. The district judge saw this. So what are you saying, that the district court should have at that moment called a mistrial? Well, yes. Yes. The district court should have called a mistrial, and the alternative, the district court should have had the hearing that we asked for in writing and several times orally in the course of this trial. And the government says there was no need for that, but the fact is even though the judge was in the courtroom and all these lawyers were in the courtroom, we have disputed issues that we still don't know the answers to, including What is the hearing that is envisioned? I'm having a little trouble with that. Well, the hearing that is envisioned would involve finding the officers who were sitting there asking them questions to determine, as was done in Norris, whether there was some kind of an intent behind this, which the government suggests is significant.  Whether there was an intent to broadcast a message. What the actual shirt said, there was a dispute between defense and government counsel whether the shirt said gang force only on the front. I'm sorry. On both sides, as defense lawyers said, or only on the back, as the government said. So what did the shirts look like? How long, as Your Honors have been asking me, how long were they actually there displaying this message? That's not perfectly clear. So to the extent the court was not prepared to grant a mistrial until it knew facts like that which remain disputed today, it could have had that hearing. And it could ask the jurors, as was done in Norris, without violating Rule of Evidence 606, did they see the message. Just couldn't ask them, did it affect your deliberations in the jury room or words to that effect. If there are no further questions, I am. In the middle of the first day of trial, they would have asked the jurors if they saw them. There were no deliberations, obviously. But they wouldn't want to get into their any discussions they might have had. But they could ask them if they had seen anything in the gallery that pertained to that, if the parties agreed that was the right course. You know, the government says that would have made things worse. Maybe that's what the parties and lawyers would have decided. But they were never given that opportunity. And the government says that it's unlike Norris because there the judge said he couldn't do anything about it. Well, the judge in this trial said that many times. He said, I have no control in this public trial. So it really is exactly the same in that respect as well. Thank you, Your Honors. The case just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Siler, Schroeder, Graber